STOCKHAM and others *vs.* BROWNING, trustee, and others.*

1. Where an old division line between lands lying on tide water has, for more than forty years, been treated by the owners as extending over the shore, or the lands between high and low water, and regarded as the division line of their right upon the shore, the line so recognized will be established as the line which will govern their rights to reclaim and appropriate the shore under the wharf act.

2. No rule for ascertaining the line by which the shore in front of coterminous shore owners shall be divided between them, has been adopted in New Jersey. But if a line claimed by one of them is more favorable to the other than that given by any of the different rules adopted by the courts of the several states, he will be protected to the line so claimed, unless a different line has been adopted by the owners, by acquiescence or otherwise.

3. The owner of lands along tide waters has an easement in the shore in front of them, and the inchoate right to appropriate them to his exclusive use. But until reclaimed, the fee is in the state, and he cannot maintain ejectment. But as he has a vested right in the shore, he will be protected in equity, against any encroachment on, or appropriation of them.

*Mr. Carpenter* and *Mr. J. Wilson*, for complainants.

---

*CITED in Stevens v. Pat. & New. R. Co., 5 C. E. Gr. 137.

The complainants and the defendant, Browning, are owners of adjoining land on the river Delaware, in the city of Camden; their respective lands being divided by an ancient line, dating back to 1695, nearly at right angles to the river. The complainants, mill owners, own above said line the shore and flats occupied as a log pond. The division line referred to, originated in the year 1695, when William Cooper, by a deed of gift, gave one hundred and fourteen acres to his son, Daniel Cooper, under which title the defendant holds. This line so created, subsists to this day, and its course, when it reaches the river, is the subject of this controversy.

The defendant, trustee under the will of William Carman, deceased, claims a right to enter upon the accretion of the river, by a line diverging to the right, when he arrives at the point where low water mark was in 1820; the line that he claims below that point, being alleged by him to be at right angles with the shore of the river. The complainants claim the right to continue this ancient line, which is their south line, in the same direction in which it strikes the river:

1. Because the rule of the common law, and the rule heretofore adopted and used in this state, seems to have been to continue the line of division into the river, in the same direction in which it strikes the river.

2. Because such rule has been adopted and acted upon conventionally, by the action and implied agreement of the parties who have heretofore successively held the lands north and south of this line.

3. Because the line continued into the river at right angles to the shore, would not sustain the defendant's claim.

I. There never has been any controversy heretofore as to this line. It has continued into the river through the quiet successive accretion, in the same direction, from its origin, until this controversy arose by the action of the defendant, by driving piling on the line claimed by him.

The remedy is necessarily by bill in equity, for it respects the shore covered by water, and ejectment, therefore, will

not lie. But besides this, the court has a general jurisdiction in case of confusion of boundaries. 1 *Story's Eq. Jur.*, § 609; *Wake* v. *Conyers*, 1 *Eden* 331; 2 *White & Tudor* 318, (1*st ed.*)

As to the rights of riparian owners. See *Angell on Tide Waters* 171; McLean, J., *Bowman's Devisees* v. *Wathen*, 2 *McLean* 377; *Rice* v. *Ruddiman*, 10 *Mich.* 125.

So far as I can discover, until of late, the English rule to continue a line between coterminous owners through the accretion, in the same direction in which it has struck the river, was held and acted upon in this state, as it still seems to be in the state of Pennsylvania. The certainty of this rule, and the uncertainty and difficulty in applying the Massachusetts rule, are strong reasons against adopting the latter.

II. But supposing the Massachusetts rule to be adopted in this state, the evidence in the case is clearly against the defendant. The rule is somewhat difficult to ascertain and to apply. The land of these parties lies on a shallow cove, irregularly indented between two headlands, Cooper's Point, and Kaighn's Point, as shown on the map produced. Supposing a straight line to be drawn between these two points, and the line to diverge from its ancient course on reaching the shore of the river, either at high or low water, it would diverge in a direction, south of the ancient line, and not north, as claimed by the defendant.

Where shall the divergence commence? It is claimed by the defendant to commence at a point where was the low water mark in 1820. This point is selected, because so far the question had been conventionally settled, by the action of those under whom the defendant claims, in that year, and always acted upon before.

The rule, as stated above, seems to be the only one applicable to such shore as this, a long shallow cove, irregular in its indentations. The extreme difficulty of applying the notion of entering the river at right angles, is seen in the many cases which have arisen in New England and elsewhere.

Rust v. The Boston Mill Company, 6 Pick. 158; Deerfield v. Arms, 17 Pick. 41, where its absurdity strikingly appears; a case, however, virtually overruled in Gray v. De luce, 5 Cush. 9.

III. But it is decisive of this controversy, that the direction of this line across the accretion into the river, has heretofore been conventionally settled. The ancient line approaches the river nearly at right angles, and it may be reasonably supposed it was intended to be run, to give to each an equal proportion of the flats.

It is now assumed, though by no means authoritatively settled, that the right of property extends only to high water mark, contrary to the previously understood rule in New Jersey. Every deed in relation to this property, in which the extent of the line into the river is mentioned, says, "to low water mark." Supposing title, strictly speaking, to go only to high water mark, yet a conventional line of extension may be well considered as established by such description. If the doctrine restricting title to high water mark should be established in this state, titles to the accretion on the shore turned into, or capable of being turned into, valuable meadows, must probably rest on this presumption of an agreement. If co-terminous owners on the river shore describe this line as running to low water mark, the extension thus given to it, they may be presumed to intend to continue, as low water mark recedes further and further into the river.

As to the doctrine of agreement, see note to the case of Commonwealth v. Roxbury, 9 Gray 451, 522, 523, and cases cited.

THE CHANCELLOR.

The dispute in this case is as to lands on the shore, or between high and low water line, along the Delaware river, in the city of Camden. The parties respectively own adjoining parcels of land bounded by the river; the parcel of

the complainants lying north of the defendant's parcel. The line separating these parcels above high water mark, is an old line which had divided the two properties for more than a hundred years, and ran to the river on a course about north seventy-nine degrees west. The complainants claim, that this line should be continued as the division line, over the shore, to low water mark. They own an extensive saw mill adjacent to these premises, and purchased the lot in question, adjoining the shore, that they might use the shore in front, for storing and keeping logs and timber. The defendant, Browning, claims that his right in the shore extends north of that division line extended; and, to carry his claim into effect, drove a row of piles from the point where the old division line meets the line of ordinary high water, diverging northwardly from the division line, and running in a straight line to low water mark. The complainants filed their bill in this cause, to restrain the defendant, Browning, from obstructing them in the enjoyment of their rights as riparian owners in the shore in front of their premises, north of the direction of the ancient line, by piles or other obstructions, and to have the line between the parties on the shore, ascertained and established. Browning, the trustee, and the two *cestuis que trust*, who are of age, filed no answer; and the bill was ordered to be taken as confessed against them. The six infant *cestuis que trust*, who are made defendants, have filed, by their guardian, the usual *pro forma* answer. Under this, the testimony was taken by the complainants, which was used at the hearing.

The parcel of land on the north of the ancient line contended for, has been held by one branch of the Cooper family for over one hundred and fifty years, and the parcel south of that line has been held by another branch of that same family, for the same length of time. This line was first created by a deed of gift, from William Cooper to his son, Daniel Cooper, dated April sixteenth, 1695. By it, William Cooper, who owned the lands on both sides of that line, fronting on the river Delaware, granted one hundred and

fourteen acres of it, lying south of this line, to his son Daniel, in fee. This made that line a division line. The complainants deduce title from William, the father; the defendants from Daniel, the son. This line is plainly called for by the conveyances on both sides of it. By a conveyance of the lands on the north side of it, dated in 1769, it is stated to run north seventy-eight degrees and twenty minutes west, to low water mark, at the Delaware river. For more than forty years past, conveyances of lands on both sides of it, by the grantors, under whom respectively both parties claim, describe this division line as running to low water mark on the Delaware river. A deed in 1843, given by John N. Lane and others, for the premises south of the line, to William Carman, describes this line as running north seventy-nine degrees west, *to low water mark* on the river Delaware. The defendant, Browning, derives his title from this William Carman, who devised to him in trust for his children, who are the other defendants. It is clear by the proof, that this line has, for more than forty years, been recognized by the owners of the land on both sides of it, as the division line between them, to low water mark on the Delaware river.

By the common law, as it existed in New Jersey before 1851, the owners of lands on the margin of tide waters had certain rights and privileges to the water, and in the shore in front of his lands, although the title was in the state. By the statute known as the wharf act, approved March eighteenth, 1851, the right to reclaim the shore in front of his lands, and appropriate it to his own use, was vested in the shore owner. What were the lands *in front* of him, and what was the boundary upon the shore between coterminous shore owners, was not settled by that act. But where such coterminous shore owners, either before or since the passage of the wharf act, had fixed the boundary of their rights upon the shore, by deeds or other instruments that would have bound them if their inchoate rights had been complete and perfect, they must, upon plain principles of

law, he held to the boundary so fixed, when their right becomes complete and perfect. They should then be held to be estopped from denying the division line to be the line so fixed.

I think that persons who have for years recognized and acquiesced in a line as separating their inchoate and imperfect rights upon the shore, should be held bound by such acknowledgment and acquiescence, for the same reason that they are held to be bound by them as to lines on upland. This seems to be the ground of the decision in the case of *O'Donnell* v. *Kelsey*, 6 *Seld*. 412, and 4 *Sandf. S. C.* 202.

But if such acquiescence and recognition have no force to settle the boundary, and recourse is had to any of the rules adopted elsewhere in such cases, which are very unsettled, the complainants' rights in the shore will, by some, be extended south of the line claimed, and will by none of them come short of it. If we adopt the rule in *Rust* v. *The Boston Mill Corporation*, 6 *Pick*. 158, approved in *Sparhawk* v. *Bullard*, 1 *Metc*. 98, and in *Deerfield* v. *Arms*, 17 *Pick*. 41, and mentioned with approval in *O'Donnell* v. *Kelsey*, the line on the shore would be much south of the ancient line extended. If we take as the rule, that laid down in Massachusetts in the more recent case of *Gray* v. *Deluce*, 5 *Cush*. 12, in which the shore line, to which it was applied, was very like that line in this case, still the line would, beyond question, diverge south of the ancient line. The rule in *Gray* v. *Deluce*, seems much more in accordance with sound principle and good sense, than that in *Rust* v. *The Boston Mill Corporation*. The rule of division adopted in Maine, in *Emerson* v. *Taylor*, 9 *Greenl*. 42, is so uncertain and impracticable, that it can never be adopted anywhere permanently, as the rule of division of the shore. It would always vary at any point on high water line, if either of the adjoining proprietors, before running the division line, should sell some of his shore front, or increase it by purchase. The Superior Court of New York, in *Nott* v. *Thayer*, 2 *Bosw*. 10, were much inclined to

extend the partition line above high water mark, as the division line of the shore below it.

As the complainants apply for the injunction and relief only to the old partition line extended, and claim nothing south of it, I have no doubt but that their right to reclaim and improve the shore, extends to that line. The piles driven by the defendant, Browning, north of that line, are an injury to them, and an obstruction to the exercise of their rights. If the complainants permit them to remain, and Browning to go on with his improvements, they may be barred by acquiescence. They have no remedy at law; although they have a vested right or easement in these lands, they are not entitled to the exclusive possession until reclaimed or enclosed, and cannot sustain ejectment.

The complainants are entitled to have the ancient line extended, declared to be the division line upon the shore between them and the defendants, and established as such; and to have the defendants enjoined perpetually from placing piles or other obstructions on the shore in front of their lands north of that line.